STATE OF NEBRASKA, APPELLEE, V. JOSE LUIS COVARRUBIAS, APPELLANT.

507 N.W.2d 248

Filed October 22, 1993.    No. S-92-500.

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and MORAN, D.J., Retired.

BOSLAUGH, J.

The defendant, Jose Luis Covarrubias, was convicted by a jury of attempted first degree sexual assault and driving while under the influence of alcohol, third offense. The defendant was sentenced to 12 to 18 months' imprisonment for the attempted sexual assault conviction and to 3 months' imprisonment for the driving while under the influence conviction, with a 15-year driver's license revocation. The sentences are to be served consecutively, and the defendant was given credit for time previously served.

The defendant appealed to the Nebraska Court of Appeals, assigning as error the State's improper use of a peremptory challenge to strike a Hispanic juror and the insufficiency of the evidence to convict on the attempted first degree sexual assault charge.

In *State v. Covarrubias*, 2 NCA 993 (1993), the Court of Appeals found that since there was no explanation in the record for the State's strike of the only Hispanic juror on the panel, the cause should be remanded for a determination of whether the prosecutor had race-neutral explanations for striking the Hispanic juror from the venire. The Court of Appeals also reversed and dismissed the defendant's conviction for attempted first degree sexual assault because it found the evidence was insufficient as a matter of law to convict the defendant on that charge.

The State petitioned for, and this court granted, further review pursuant to Neb. Rev. Stat. § 24-1107 (Cum. Supp. 1992).

The record shows that a juror named "Garcia" was struck from the venire. Garcia said that he spoke Spanish, but he indicated that if selected, he would use the interpreter's translation as the evidence. Garcia answered affirmatively when the trial court asked the potential jurors if members of their families had been involved in similar crimes. Neither the prosecution nor the defense inquired further of Garcia as to the specifics of his family's involvement in either type of crime.

Using one of its peremptory challenges, the State struck Garcia from the jury. After all peremptory challenges had been exercised, an unrecorded side-bar conference occurred.

Immediately following the side-bar conference, the jurors who had been selected were sworn, and the other jurors were excused. The defendant's attorney then made a formal objection on the record based on the decision of the U.S. Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which held that the Equal Protection Clause guarantees criminal defendants that members of their race will not be excluded from juries by the State on account of their race. The objection in this case was made out of the presence of the jury and after a joint stipulation had been made that the defendant and Garcia were both Hispanic.

The trial court found, without comment, that the defense had not made out a prima facie case under *Batson*. The prosecution was not required to provide race-neutral

explanations for the peremptory strike of Garcia, and it did not volunteer any explanation.

The evidence shows that on May 19, 1991, the victim, K.J., age 19, went to a dance at the Latin Club in Grand Island. The defendant was present at the dance.

K.J. knew the defendant from their employment at IBP, and the defendant lived in the same trailer court as she did.

K.J. danced with the defendant twice after he asked her. She asked him twice for a ride back to Lexington when the dance ended at 12 or 12:30 a.m.

The defendant testified that he initially did not want to drive back to Lexington because he had been drinking heavily that evening. He suggested that K.J. drive his truck while he rode as a passenger, but she was unable to manage the gearshift.

The defendant agreed to drive, and they began their trip back to Lexington via Interstate 80. Near Wood River, the defendant claimed that the truck was overheating, making it necessary to leave the Interstate near the truckstop at the Wood River interchange. Rather than stop at the truckstop, the defendant chose to drive on to his cousin's house. En route to his cousin's house, the defendant claimed that his truck stopped and would not start again. K.J. testified that she thought the defendant had made his truck stall and was not putting in the clutch to enable it to start.

After the defendant's truck stopped and would not start again, he moved closer to K.J. and said, " 'Come on; let's do it,' " and " 'This wouldn't be your first time.' " At that point, according to K.J., the defendant's hands were "[e]verywhere." She further stated that the defendant "put his hands on my breasts and he would put his hand on my crotch. . . . He just kept saying, 'Come on, come on,' and then he'd say something in Spanish that I didn't understand."

K.J. testified that the defendant somehow had hold of her legs and her left arm. When she tried to get out of the truck, the defendant locked the door. K.J. testified that when she was able to get out of the truck, she slipped out of her sweatshirt, since the defendant was holding onto the shirt.

When the defendant followed K.J. outside the truck, he grabbed her, and then she hit the defendant in the stomach,

knocking him down, and ran to the truckstop.

K.J. and a Hall County deputy sheriff later returned to the area where the defendant's truck had been. She told him that the defendant had moved the truck and that it looked like he tried to turn the truck around and got stuck.

The defendant was found asleep in the truck, lying on his right side with his legs and waist still under the steering wheel and the sweatshirt on the passenger side of the cab. The results of an Intoxilyzer test showed that the defendant had ".194 of a gram of alcohol per 210 liters of breath."

The State contends the Court of Appeals erred in creating a new procedural rule concerning the timing of a *Batson* objection; considering an assignment of error that was not properly raised, preserved, and assigned as error; "attempting to resolve prior rulings of this Court which the Court of Appeals deems 'irreconcilable and inconsistent' "; drawing the conclusions it did regarding the *Batson* objection; and determining that the evidence was insufficient as a matter of law to support the defendant's conviction for attempted first degree sexual assault.

In its analysis of the defendant's assignment of error regarding his *Batson* challenge, the Court of Appeals announced a new procedural rule as to when a *Batson* objection must be made. The Court of Appeals stated the rule as follows:

> The rule we adopt today . . . should give the trial courts as much flexibility as possible to deal with the situation which would arise should a trial court conclude that a prosecution's peremptory strike of a juror having racial identity with the defendant was not race neutral. To preserve that flexibility, the *Batson* objection should be made, out of the venire's hearing, immediately upon the completion of the peremptory strikes but before the strikes are announced to the venire and before the jury is sworn and the balance of the venire excused.

*State v. Covarrubias*, 2 NCA 993, 999 (1993).

Although the record reflects that the defendant's *Batson* objection came after the jury had been sworn and the balance of the venire, including Garcia, excused, the Court of Appeals held that the objection had not been waived, apparently

because defense counsel claimed at oral argument that an initial *Batson* objection was made at the unrecorded side-bar conference which occurred after the peremptory challenges had been exercised.

It was unnecessary for the Court of Appeals to create a rule concerning the timing of a *Batson* objection because Nebraska statutes provide when an objection pertaining to a failure to comply with the *Batson* requirements should be made. In Neb. Rev. Stat. § 25-1601.03(4) (Reissue 1989), the Legislature provided that one of the purposes of Chapter 25, article 16, is to ensure that no citizen is excluded from jury duty because of discrimination based upon race, color, religion, sex, national origin, or economic status. Neb. Rev. Stat. § 25-1637(1) (Reissue 1989) provides that a motion for relief based on the ground of substantial failure to comply with Chapter 25, article 16, must be made before the jury is sworn to try the case.

Accordingly, the defendant's *Batson* objection should have been made prior to the swearing of the jury. Since the record does not indicate that the defendant made his *Batson* objection prior to the jury being sworn, the Court of Appeals erred in finding that the defendant had not waived his objection. When reviewing the decision of a lower court, an appellate court may consider only evidence included within the record. *Home Fed. Sav. & Loan v. McDermott & Miller*, 243 Neb. 136, 497 N.W.2d 678 (1993).

The State claims that the Court of Appeals erred in considering an error that was not properly raised, preserved, and assigned as error. This assignment is frivolous and without merit. The error referred to by the State is the defendant's assignment concerning the sufficiency of the evidence to convict him on the charge of attempted first degree sexual assault. The brief filed by the defendant in the Court of Appeals reflects that the assignment was properly before the Court of Appeals and was thoroughly discussed in the brief.

Next, the State contends that the Court of Appeals erred in retaining jurisdiction of the defendant's appeal because it found prior rulings of this court to be inconsistent and that the issue regarding the defendant's *Batson* objection was one of first impression for this state. The State argues that Neb. Rev. Stat.

§ 24-1106 (Cum. Supp. 1992) required the Court of Appeals to recommend removal of this case to the Supreme Court because of the alleged inconsistency it found between *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992), and *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992), and because it considered the issue concerning the defendant's *Batson* objection to be one of first impression.

Section 24-1106(3) provides that the Court of Appeals may, on its own motion, recommend removal of a case from its docket to the Supreme Court at any time before a final decision on the case has been made by the Court of Appeals. However, nothing in the statute mandates the Court of Appeals to recommend removal of a case from its docket to the Supreme Court, and it was not error for the Court of Appeals to retain jurisdiction of the defendant's appeal.

The State argues that the Court of Appeals erred in finding that the defendant had made a prima facie case under the *Batson* decision. We agree.

In order to make a prima facie case under *Batson*:

[A] criminal defendant must show that (1) she or he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove members of the defendant's race from the venire, and (3) the facts and other relevant circumstances give rise to an inference that the prosecutor used those challenges to exclude potential jurors because of their race.

*State v. Rowe*, 228 Neb. 663, 668, 423 N.W.2d 782, 786 (1988).

In the present case, the State stipulated to the first two elements. The third element may be supported or refuted by "the prosecutor's questions and statements during *voir dire* examination." *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The Court of Appeals found that the prosecutor's failure to make any inquiry of Garcia after his affirmative answer to the trial court's question about familial involvement in crimes similar to those with which the defendant was charged justified an inference that the prosecutor used his peremptory challenge of Garcia to exclude him because of his race.

In *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987),

the defendant assigned as error the trial court's failure to find that he had made a prima facie showing under *Batson*. This court stated that the standard of review in that case was whether the trial court's decision was clearly erroneous.

In support of his assignment of error, the defendant in *Alvarado* argued that the prosecutor's lack of questioning of the juror he peremptorily challenged was a circumstance which, combined with the first two *Batson* elements, raised an inference of purposeful discrimination. This court determined that the prosecutor's lack of questioning did not raise an inference of discrimination. We went on to state that even if the prosecutor's lack of questioning had been sufficient to raise an inference of purposeful discrimination, he provided a neutral explanation for his strike.

In the case at bar, the trial court's determination that the defendant had failed to make a prima facie case was not clearly erroneous. The State's failure to question Garcia after the trial court's question concerning familial involvement in similar crimes did not support an inference that the State struck Garcia because of his race. Garcia's affirmative response to the trial court's question tends to refute a discriminatory purpose on the part of the State.

The Court of Appeals found that the defendant had made a prima facie *Batson* showing, and it remanded the cause for further proceedings because the State gave no explanation for its peremptory challenge of Garcia. Since in this case the defendant failed to make a prima facie showing of purposeful discrimination under *Batson*, the State was not required to provide a neutral explanation for its challenge of Garcia. See *Alvarado, supra*.

Finally, the State contends the Court of Appeals erred in reversing and dismissing the charge of attempted first degree sexual assault because it found that the evidence was insufficient as a matter of law to support the defendant's conviction on that charge.

The Court of Appeals correctly applied the standard of review set forth in *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992), but also commented that the standard of review in *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992), is

irreconcilable and inconsistent with *Sexton* because "*LaFreniere* requires reasonable inferences from circumstantial evidence to be taken most favorably to the accused upon appellate review of sufficiency of the evidence and *Sexton* requires that an appellate court take the view of the circumstantial evidence which is most favorable to the State." *State v. Covarrubias*, 2 NCA 993, 1006 (1993).

*Sexton* holds that in criminal cases, circumstantial evidence is to be treated the same as direct evidence, and the State, upon review, is entitled to have all conflicting evidence, direct and circumstantial, and the reasonable inferences which can be drawn from the evidence viewed in its favor. *LaFreniere* holds that in determining the sufficiency of circumstantial evidence to support a conviction, any fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused. *LaFreniere* requires a reasonable inference from circumstantial evidence to be taken most favorably to the accused when circumstantial evidence is the only basis upon which to support a conviction and the circumstantial evidence is reasonably susceptible of two interpretations, one of guilt and the other of nonguilt, and neither inference is stronger than the other. See, also, *State v. Ruiz*, 241 Neb. 693, 489 N.W.2d 865 (1992); *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992).

The evidence in this case supporting the defendant's conviction of attempted first degree sexual assault is primarily direct, consisting of the testimony of the victim. The Court of Appeals erred in finding the evidence insufficient as a matter of law to convict the defendant of attempted first degree sexual assault.

In order to convict the defendant of attempted first degree sexual assault, the jury had to find that the defendant took a substantial step to sexually penetrate the victim after overcoming her by force or threat of force, express or implied; coercion; or deception.

The evidence, when viewed in favor of the State, shows that the defendant, after dancing twice with K.J. at the Latin Club, agreed to drive her home. On the way home, the defendant claimed he was having car trouble and left the Interstate,

heading toward his cousin's house. The defendant pretended his vehicle would not start. The defendant began to grab K.J.'s crotch and her breasts, saying " 'Come on; let's do it,' " and " 'This wouldn't be your first time.' " When K.J. attempted to leave the truck, the defendant locked the door and held onto K.J.'s leg, arm, and sweatshirt. K.J. escaped by slipping off her sweatshirt. When she was outside the vehicle, the defendant grabbed K.J., prompting her to hit him in the stomach. K.J. then ran to a truckstop and returned with the deputy sheriff to find that the truck had been moved and that the defendant was asleep with K.J.'s sweatshirt in the cab. The evidence and the reasonable inferences that could be drawn from it were sufficient to support the jury's conviction of the defendant for attempted first degree sexual assault.

The judgment of the Court of Appeals is reversed, and the cause remanded with directions to reinstate the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.

SHANAHAN, J., not participating.